```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 10/22/19
```

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------X
UNITED STATES OF AMERICA,

                            -against-

JON MONTROLL,

                            Defendant.
-------------------------------------------------------------X

**RESTITUTION ORDER**

18 Cr 520

     Having reviewed the record, including the parties' written and oral submissions, the restitution hearing held on September 10, 2019 (which along with related submissions is incorporated in its entirety here by reference) and the supplemental submissions of counsel, dated October 11, 2019, from the defense, and dated October 16, 2019 from the government, the Court finds by a preponderance of the evidence that Defendant's restitution obligation is 155,572.53. This amount is close to the parties agreed upon amount restitution of $167,438.00 as set forth in the plea agreement, dated July 18, 2018. ("The Defendant further agrees to make restitution in an amount ordered by the Court in accordance with Title 18, United States Code, Sections 3663, 3663A, and 3664, including at least $167,438.") (Plea Agreement dated July 18, 2018 at 2); ("The defendant also agrees not to appeal any restitution or forfeiture order that is less than or equal to $167,438." (Id. 5.))

     Specifically, the Court finds, among other things,

     1) This order of restitution is properly being entered somewhat more than 90 days following sentencing with the parties' joint consent (See Transcript dated October 8, 2019). See Dolan v. United States, 560 U.S. 605, 611 (2010) ("The fact that a sentencing court misses the

statute's 90-day deadline . . . does not deprive the court of the power to order restitution.") .

2) The government has met its burden of proof, by a preponderance of the evidence, that the amount of the loss sustained by the identified victims is $155,572.53. See 18 U.S.C. §§ 3663A, 3664 and United States v. Lauersen, 287 F. App'x 115, 116 (2d Cir. 2008).

"We reiterate that the MVRA [Mandatory Victims Restitution Act] requires only a reasonable approximation of losses supported by a sound methodology. . . '[T]he preponderance standard must be applied in a practical, common-sense way. So long as the basis for reasonable approximation is at hand, difficulties in achieving exact measurements will not preclude a trial court from ordering restitution.'" United States v. Gushlak, 728 F.3d 184, 196 (2d Cir. 2013) (citing United States v. Savoie, 985 F.2d 612, 617 (1st Cir. 1993).)

3) The Court credits the testimony of the only witness to testify re: restitution, Government's witness, Daphne Downes, who is is a certified public accountant and a certified fraud examiner and is employed by the U.S. Securities and Exchange Commission as a Senior Staff Accountant and Investigator, as supplemented by the government's letter dated October 16, 2019. Her testimony was entirely credible. Ms. Downes testified that she was asked to - - and did - - calculate the post hack losses with respect to the "users" of Ukyo loan investments. Relying upon information supplied by the Defendant, Ms. Downes isolated all of the Ukyo loan activity from, e.g., the BitFunder transaction files. (9/10/19 Tr at 6 & 10.) Ms. Downes testified that for each user, she summed up all of the debits and credits to determine whether there was a net gain or net loss in each user's account with respect to Ukyo loan activity. (9/10/19 Tr at 10.)

Ms. Downes also testified that she made certain adjustments but only those based upon verifiable "buybacks of the UKYO security that Mr. Montroll represented he had made," thus

reducing loss amount and Montroll's potential restitution obligation. (9/10/19 Tr at 12:15-16.) Ms. Downes also testified that she attempted to verify each of the buybacks Mr. Montroll claimed that he made and was able to verify them with a few exceptions (totaling 1.93 bitcoin). (9/10/19 Tr at 13.) Other buyback adjustments which the Defendant claimed, were correctly <u>not</u> credited by Ms. Downes because, as she explained: "in the original list of buybacks that [she] was provided by the U.S. Attorney's Office . . . there were claims for buybacks between two of Mr. Montroll's own accounts which I excluded, i.e. identified as user account # one and user account # ten. And, there was at least one [claim] that was fairly large and that was an inappropriate buyback. It certainly wasn't from a customer, so that was excluded." (9/10/19 Tr at 23:15-21.) And, Ms. Downes explained that she also attempted to verify other claimed transactions which arguably could have resulted in reduced restitution owed by the Defendant but that she was unable to do so based upon her review of the records (which, as noted, came from Defendant). (9/10/19 Tr at 32.)

Ms. Downes prepared several helpful spreadsheets. She testified that the totals row under the "adjusted negative balances after buybacks" in GX 1 (Tab 1, second red column; Tab 2 second red column) in the amount of **-1952.337256** bitcoin reflects "the total losses for all the users calculated after we had given Mr. Montroll credit for the buybacks from the specified participants in his list as noted in the green column." (9/10/19 Tr at 15:6-9.) <u>When asked if she was referring to "the total number of UKYO users suffering losses adjusted for buybacks identified by Mr. Montroll in the course of these proceedings?", Ms. Downes replied:</u> **"That's correct."** (9/10/19 Tr 15:10-13.)

Ms. Downes testified that the totals row under the adjusted negative balances after buybacks in GX 1 (Tab 2 third red column) in the amount of **-1488.257335** bitcoin reflects the

Page 3 of 9

loss (restitution) amount, assuming that Defendant was not being held responsible for the "pre-hack" activity by users. (9/10/19 Tr at 15-16.) According to Ms. Downes, this restitution figure "**excludes** all of the buys that occurred before July 31, 2013 and the relevance of that date is that Mr. Montroll, according to the records that we have - - and I think his own admissions - - learned of the hack on July 30, 2013 and did not disclose it to investors." (9/10/19 Tr at 18:4-9.) The Court agrees with this approach.

Ms. Downes indicated that the above amounts of -1952.337256 and -1488.257335 bitcoin (described above) represent losses based upon user account numbers and, therefore, also include individuals for whom there is no identifying information. (9/10/19 Tr at 28.) The Court requires that restitution be paid only to users who are identifiable victims. See, e.g., United States v. Berardini, 112 F.3d 606 (1997) (restitution ordered for victims identified by name only).

Ms. Downes also testified that the primary source of bitcoin valuation that she relied upon was "bitcoincharts.com" but also that the underlying sources were Mt. Gox and Bitstamp. (9/10/19 Tr at 28.) The Court relies upon Mt. Gox and Bitstamp because it finds, as testified to by Ms. Downes, that they were the "two largest bitcoin currency exchanges". (9/10/19 Tr. at 30:6-7.) Ms. Downes also testified that she estimated the average price for the (relevant) time period of the activity in Ukyo loan shares to be $108 per bitcoin based upon the Mt. Gox pricing. (9/10/19 Tr at 20.) The Court believes this is a reasonable approach for purposes of calculating restitution.

Ms. Downes also reviewed the Defense exhibits SS, GGG and HHH which emphasized by the defense at the October 8, 2019 hearing. She concluded that "Montroll seeks 'credit' for transfers made to approximately 22 Ukyo.Loan users who did not suffer Ukyo.Loan losses and

for whom the Government has not sought restitution. That is, these transfers do not 'offset' the losses of any of the identified victims. Montroll includes transfers to two individuals who did not hold Ukyo.Loans. These transfers do not 'offset' the losses of any identified victims, either. Montroll seeks 'credit' for transfers made to a few Ukyo.Loan users that, if accurate, would cause those users to have a positive Ukyo.Loan account balance. Treating the value of these transfers as a credit would impermissibly offset a portion of the losses to some Ukyo.Loan users by reference to gains paid to other Ukyo.Loan users." (Govt Letter dated Oct. 16, 2019 at 3-4.) The Court concurs with this approach.

4) The government concludes that the proper restitution amount is $155,572.53. The most recent defense proposed restitution amount is $59,967.50. The Court agrees with the Government.

5) The Court is entering the restitution Order, dated October 16, 2019, submitted by the Government. This restitution amount mirrors the Court's proposed restitution with the very minor exception of one individual, Karol Stuy, who had a loss of $294.98. The Court had not accounted for Karol Stuy previously. There is also an insignificant $2.63 difference between the Court's restitution calculation on October 8, 2019 and the Government's proposed restitution figure. The Court attributes the $2.63 difference to a mathematical error and accepts the Government's calculation.

6) The $20,000.00 which the defendant deposited with the Clerk's Office toward restitution is credited toward the total defense restitution obligation of $155,572.53, i.e., the Defendant will only be required to pay $135,572.53 additional. The $135,572.53 restitution balance shall be payable as follows: If the defendant is engaged in a BOP non-UNICOR work program, the defendant shall pay $25 per quarter toward the criminal financial penalties. If the

defendant participates in the BOP's UNICOR program as a grade 1-4, the defendant shall pay 50% of his monthly UNICOR earnings toward the criminal financial penalties, consistent with BOP regulations at 28 C.F.R. § 545.11. If any portion of the financial penalties remains unpaid at the time of defendant's release from prison, they shall be paid in monthly installments of 15% of Defendant's gross revenues. On July 11, 2019, Defendant was sentenced to 14 months of incarceration.

7) The Court has considered and rejected proposed various other restitution amounts in the parties' various submissions and arguments in support of those amounts. (See Transcript dated Oct. 8, 2019). For example,

a) a $25,000.00 credit (claimed by Defendant) is rejected because that amount was not paid by the defendant to Ukyo loan users. See, e.g., Def Letter dated March 30, 2019 at 9 ("25,000 paid to victims of misappropriation"). And, as noted by the Government, "Montroll inflicted losses on Ukyo.Loan holders; those persons' losses are separate from losses caused by Montroll's misappropriation." (Govt Letter dated Oct. 16, 2019 at 2.) The fraud to which the defendant "pled guilty in connection with the sale of Ukyo Loans was that, after the hack, he failed to disclose the hack and falsely represented that BitFunder's operations were going well." (Def Letter dated March 30, 2019 at 4.) See also Transcript of plea allocution dated 7/23/18 at 24:6-17 (Defendant: "In late July 2013, WeExhange was hacked and thousands of bitcoins were stolen from WeExchange. Shortly after the hack began, I became aware that WeExchange users had been hacked. Despite that knowledge, I continued to promote the Ukyo loan and success of BitFunder. I also did not disclose that WeExhange had been hacked and that thousands of bitcoins had been stolen from WeExchange. After the hack, I continued to raise bitcoins from purchasers of the Ukyo loan, knowing that some users would rely on my false statement and

fraudulent statement and omission about the success of my bitcoin ventures.")

b) a $50,307.24 credit claimed by the defense in an exhibit marked HHH is rejected because, as already noted, it is "not associated with Ukyo.Loan users"; it reflects transfers for "Ukyo.Loan users who did not suffer Ukyo.Loan losses and for whom the Government has not sought restitution"; it reflects individuals "who did not hold Ukyo.Loans." (Govt Letter dated October 16, 2019 at 3-4.). And, the defense has used a dollar value of $730.60 for each bitcoin - rather than the dollar value of $108 adopted by the Court. See also Transcript of proceedings held on 9/10/19 and 10/8/19.[1]

8) There is no Brady violation in connection with the restitution analysis.

The defense contended that the government violated its obligations under Brady v. Maryland, 373 U.S. 83 (1963) in that it failed to produce notes of various telephone conversations the defendant had with Ms. Downes. (Def Letter dated Oct 11, 2019, at 4 fn1.) The government counters persuasively that there was no Brady violation. It states that "Montroll possesses the supposedly favorable information he alleges the government has kept from him, and, in fact, has used it in these [restitution] proceedings. Montroll himself participated in the calls with the S.E.C., plainly remembers that he tried to 'remedy' his obstruction of justice during those calls, and Montroll's counsel has referenced Montroll's efforts to provide assistance to the S.E.C. both prior to sentencing, during sentencing, and during the restitution hearing." (Govt Letter dated Oct 16, 2019 at 5.) The government also states it does not have notes to produce to the defendant. And, the government points out that "Notwithstanding Montroll's assertion that Ms. Downes was a member of the prosecution team, she is not." (Id.) "In a good

---

[1] Any issues or arguments not specifically discussed in this Order were considered by the Court and rejected.

faith effort to collect prior statements of Ms. Downes, the Government requested copies of the S.E.C.'s notes of its calls with Montroll, but the S.E.C. declined to provide them. When Montroll's counsel requested the S.E.C.'s notes by email following the restitution hearing, the government again requested copies of the S.E.C.'s notes but the S.E.C. again declined to provide them." (Id.)

The Court finds there was no Brady violation. For one thing, the Court was never requested to intervene on defendant's behalf. More importantly, "Brady does not require the government to turn over exculpatory evidence if the defendant knew or should have known the essential facts permitting him to take advantage of any exculpatory evidence." United States v. Grossman, 843 F.2d 78, 85 (2d Cir. 1988). And, "whether the Government's disclosure duty extends to evidence maintained by another federal agency depends on whether the agency is an arm of the prosecutor or part of the prosecution team." United States v. Morgan, 302 F.R.D. 300, 304 (S.D.N.Y. 2014) (VM). There has been no showing by the defendant here that the SEC was an arm of the prosecutor or part of the prosecution team. "[T]he inquiry is the extent to which there was a joint investigation with another agency." United States v. Upton, 856 F.Supp. 727, 750 (E.D.N.Y. 1994) (LIG). See also United States v. Blaszczak, 2018 WL 1547092 (S.D.N.Y. Mar. 29, 2018) (LAK).

9) The Court is amending the Judgment and Commitment Order imposed on July 11, 2019 to include the total restitution amount of $155,572.53. A separate restitution order, as noted, will be filed (with victim information filed under seal) on the docket. All other terms of the Judgment, dated July 11, 2019, remain in full force and effect.

Defendant, has been advised as follows: To the extent that you have not already waived your appeal rights pursuant to the plea agreement dated July 18, 2018 - - as discussed on page 1

above, i.e., pursuant to the plea agreement signed July 23, 2018, defendant agreed not to appeal any restitution or forfeiture order that is less than or equal to $167,438.00 - - you have the right to appeal this restitution aspect of your sentence; if you are unable to pay the cost of an appeal, you have the right to apply for leave to appeal in forma pauperis. If you request, the Clerk of Court will prepare and file a notice of appeal on your behalf immediately. Do you understand your appeal waivers and any appeal rights? Defendant's answer was "yes."

Dated: New York, New York
October 22, 2019

*RMB*

**RICHARD M. BERMAN, U.S.D.J.**